● Judge Kosik     Case 05-CR-0493

Please review what FBI Agents Noone and Whitehead did in this case for you —

They planted the evidence

● Want proof? — call USA Peter J. Smith Harrisburg Office —
  (717) 221-4482
  Ask him whats in file # 10-3813
  (see last page)

  Kevin Reardon (informant) altered the grenades, planted them with FBI approval
● and sent the Pa & Ny emails.
  Want to fix it now???

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL CURTIS REYNOLDS,
PETITIONER,

VS.

UNITED STATES OF AMERICA,
RESPONDENT.

**FILED
SCRANTON**

MAR 2 9 2018

PER _____ DEPUTY CLERK

CASE # _____

JUDGE: _____

---

### AMENDMENT TO HAZEL-ATLAS MOTION FOR
### FRAUD UPON THE COURT;

---

Inthat no prejudice can be inferred by the Government, since no Briefing Schedule has been issued to date, this Amendment, a Due Process Constitutional violation exists in the matter, one which proves the Petitioner to be **ACTUALLY INNOCENT**, and was indeed, as claimed, **PHYSICALLY IMPOSSIBLE** to have committed the email crime, as charged;

"**Use of his Desktop Computer while in the Middle District of Pennsylvania**"
through the Affidavit enclosed, EXHIBITS within the possession of the US Attorney's Office, 228 Walnut Street, Harrisburg, PA, 17108, and the other EXHIBITS enclosed herein, and on Court's Record, [requesting this Court enforce Judicial Notice, F.R.Evid. §201(c)(2);

'A Court **MUST** take Judicial Notice when supplied with the location information that can be easily verified,'
and §201(e);

'A party is **ENTITLED TO A HEARING** upon a timely request, [as is made herein], whether or not Judicial Notice is given.' ],
of West Virginia Case #17-cv-0124, Clarksburg, wherein the enclosed Affidavit was presented as an intergral part of the Original Brief, thus response was required by the Court's Order, and **the facts within the Affidavit, none of them, were denied**. Those facts show:

1) The FBI, Joseph Noone and/or Larry Whitehead, did cooperate in the planting of the evidence, the live grenade in the storage unit #315, to entrap Petitioner.

2) The FBI Agents knew that their informant, Kevin Reardon, did plant the evidence, a live grenade, at 346 Scott Street on April 23, 2005 to entrap Petitioner.

3) All Pennsylvania emails were TRACED TO 346 SCOTT STREET, where informant Kevin Reardon held access to, as well as storage unit #315, in order to entrap Petitioner.

AFFIDAVIT OF:

MICHAEL CURTIS REYNOLDS                              CASE #

I attest to the following as true:
Joseph Noone and/or Larry Whitehead, FBI Agents herein the matter of case #05-cr-0493, did cooperate with their informant, Kevin Reardon, to **plant evidence, a live handgrenade**, in the toolbox property of Petitioner, in Storage Unit #315, in order to entrap this Petitioner.

Informant Kevin reardon had altered an inert handgrenade, **which Kevin Reardon had removed PRIOR to the April 23, 2005 State search of 346 Scott Street, along with a duffle bag containing two other inert handgrenades, a dozen M-16 clips, armor piercing SS109 ammunition and more**, the property of Daniel Reynolds, not Michael Reynolds, [Petitioner], altered a grenade, **then planted this evidence, a live handgrenade**, at 346 Scott Street, in a Tote Bin, [which his wife "conveniently" found], in order to entrap this Petitioner. [See: **EXHIBITS 1,2**] [File #10-3813].

Informant Kevin Reardon, who, in his FBI 302 statement, did declare that he held the access keys to 346 Scott Street and Storage Unit #315, 'since the beginning,' did send and receive the **TRACED emails by the FBI, ALL OF WHICH CAME AND WENT FROM 346 SCOTT STREET**, as none were physically possible from Petitioner, **WHOSE DESKTOP COMPUTER, AS CHARGED, CONTAINED NO COMPUTER MONITOR WITH WHICH TO HAVE SENT/RECEIVED ANY EMAILS**. [See: **EXHIBITS 3, 4**].

Informant Kevin Reardon altered **BOTH INERT HANDGRENADES**, by the addition of gunpowder and a fuse on both.

Pennsylvania District Attorney's Office **REFUSED to issue even search warrants**, due to informant Kevin Reardon's **TAINT OF THE SEARCH SITES**, the adding and removal of items from both 346 Scott Street and Storage Unit #315, to and from his own home in Binghamton, NY,

**FOR EIGHT DAYS PRIOR TO THE APRIL 23, 2005 STATE SEARCH.**
[See: **EXHIBITS 5a and 5b**]. **EXHIBT 5a** states that no bomb-dog discovery of Kevin's "found" **duffle bag with grenades**, because of File #10-3813's statement –

**KEVIN HAD ALREADY REMOVED THE DUFFLE BAG WITH GRENADES TO HIS BINGHAMTON, NEW YORK HOUSE, FROM THE 346 SCOTT STREET ADDRESS.**

Informant Kevin Reardon also spent –
**EIGHT MONTHS PRIOR TO THE DEC. 5, 2005 FBI "SEARCH" [for the very grenades they planted with informant Kevin Reardon's assistance]**, tainting that search area as well.

Email accounts from the very AOL login-names in this matter, were hacked and stolen off of Ebay from this Petitioner, while he was in Austria, April, 2005, and through the use of Petitioner's Citizen's Bank Credit Card, [also part of the 'evidence' in this matter, in the Affidavit of Probable Cause], a **Nikon Coolpiks 5 Camera** was bought off Ebay for $300, shipped to 346 Scott Street,

**WHERE INFORMANT KEVIN REARDON DID RECEIVE IT FROM UPS.**

The Yahoo accounts used in this matter have **no traceability**, as they do not require credit cards nor any verification of identity whatsoever. Therefore, the FBI's **traced emails must be the AOL accounts**. Informant Kevin Reardon, being an In-Law, knew this Petitioner's AOL Account names and Passwords since 2000, when Petitioner stayed at Informant Kevin Reardon's house, and used his computer, which saves the passwords used.

Informant Kevin Reardon has a twenty-plus year history of theft and illegal actions towards this Petitioner-

1985 - Theft by deception: Kevin took a 1983 Blue Plymouth Sapporo from Petitioner, then closed the bank account with **12 post-dated payment checks still pending**. a $4400 vehicle.

1995 - Kevin altered the Title of Petitioner's Connecticut Silver Dodge Caravan, over to a New York Title in his own name. When the vehicle was returned, Connecticut tried to arrest this Petitioner for a Fraudulent Title. Petitioner was forced to scrap his own vehicle. a $7500 vehicle.

Informant Kevin Reardon worked in Scranton, **only 15 minutes away from 346 Scott Street**, thus Kevin Reardon was also in the Middle District of Pennsylvania Nov. 10-16th, 2005, with keys to **both 346 Scott Street and Storage Unit #315, our "search sites" before, during and after this matter's timeline.**

Informant Kevin Reardon lived in Binghamton, New York, **less than a half-a-block from Joyce Reynolds address'**, [where the New York emails were claimed to come from, but never traced], where Petitioner stayed from Nov. 21-24th, 2005.

Informant Kevin Reardon swore, in an FBI 302 statement, to **viewing all of Petitioner's Computer(s), [Desktop and Laptop], locked in Petitioner's vehicle on Nov. 23rd, 2005**.

**[ASK THE FBI FOR THE NOV. 23rd, 2005 302 STATEMENT]**.
Informant Kevin Reardon, living only a half-a-block away, had full computer access to both send and receive emails on Nov. 23rd, 2005. [See: **EXHIBIT 6**] Petitioner did not have access to emails, nor any computers. [See: **EXHIBIT 7** ].

## TWO EMAILS WERE SENT AND RECEIVED ON NOV. 23rd, 2005.

File #10-3813, at the US Attorney's Office, 228 Walnut Street, Harrisburg, PA. 17108 has most of these facts already. The enclosed **EXHIBITS** prove the extent of the FBI's fraud herein.

There never was any 'confession' to any 'threat to blow up the **Standard Oil Company of Perth Amboy, NJ**', since the Statndard Oil Co. has not existed there since 1932. No buildings have existed there since 1983. There is **no video of the confession**. There is no **audio of the confession**. There is no **signed statement of the confession**.

1) You can not 'confess' to threaten a place that does not exist. **Standard Oil in Perth Amboy does not exist.**

2) The FBI can not furnish proof of this 'confession,' **since this 'confession' never took place.**

This document is hereby certified under penalty of perjury pursuant to Title 28 U.S.C. §1746 the aforesaid as true and correct.

Signed: _____
Reg. # 106/1023
FCI Hazelton, PO BOX 5000
Bruceton Mills, WV 26525

FILE - STAMP HERE

## HAZEL-ATLAS REQUIREMENTS :

In order to apply a Hazel-Atlas, this Circuit has determined that the test within __Herring__, 424 F.3d 384, 386 (3rd Cir. 2005) must be satisfied. That test consists of:

### 1)   An intentional fraud occurred :

The fraud began with the original arrest for a non-criminal act, the inert handgrenade of 346 Scott Street, on April 23rd, 2005. That grenade did not function, but was __disassembled by use of a .50 cal device, and discarded.__ It continued by the perjured Affidavit of Probable Cause, followed by the faked emails sent by Informant Kevin Reardon __TRACED by FBI to 346 Scott Street__, and the second __planted grenade in Storage Unit #315 by Reardon and FBI Agents.__ Grand Jury was perjured to, repeatedly to obtain illegal Indictments, and the Trial jury was lied to even more, with the faked 'confession' of a threat to __Standard Oil Co., Perth Amboy, NJ that has not existed since 1932, then the falsified PSI with two 'felony convictions' that never occurred.__

### 2)   The fraud was by an officer of the Court :

Both FBI Agents were parties of the Government Investigation Team of the Prosecutor, thus all three were Officers of the Court, and in gact, they were assisted by the counselor for the defense, Joseph O'Brien, who closed the Court to family, friends and witnesses for the defendant, such that it aided the Prosecution's case by no counter-testimonials being made. Thus all four Officers of the Court cooperated in this Fraud.

### 3)   That fraud was directed at the Court itself :

The frauds, and there were many, were directed at the Magistrate, to issue warrants that were illegal, at the Grand Jury, to Indict illegally, at the Trial jury, to mislead and outright lie about issues, covering their own illegal __planting of the grenade evidence and their own Informant sending/receiving the TRACED emails to 346 Scott Street__, not to mention the Appeals Court as well.

### 4) that fraud in fact did deceive the Court:

Magistrate Mannion did issue the warrants, unknowingly illegal, to arrest and search this Petitioner, the Grand Jury to repeatedly Indict this Petitioner, not knowing that the FBI created the evidence itself, the trial court and Petit Jury to convict this Petitioner, and even Judge Kosik to sentence, in a constructive amendment, to a §922(g)(1) charge, when Petitioner was Indicted on a §5845 charge, and the Two 'felonies' on the PSI were falsified by the same FBI Officers. It even deceived the Appeals Court to confirm the conviction. This Fraud continued even into the §2255, wherein it was proven the Judge kosik did tamper with witness Joyce Reynolds' testifying, threatening jail should she appear in his Court. US Attorney Peter J. Smith still withholds __Brady__ material in file #10-3813 since 2010.

This standard test, the application of a __Hazel-Atlas raud Upon the Court__, is to be included within any Motion under the __Hazel-Atlas__ heading, as a sceening tool for the Courts to determine the Structural error that requires Court intervention and correction.

1)     Was an Act or Act(s) of Fraud Upon the Court, [Hazel-Atlas], done in Case #05-cr-0493 against this Petitioner, that consisted of Constitutional ---level violations of rights ?

[continuing in **Napue**] - "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in **testifying falsley** that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, **People vs. Savvides**, 1 NY2d 554, 557, 154 NYS 2d 885, 887, 136 NE2d 853, 854, 855.

**"IT IS THE PROVINCE OF THE JURY TO DETERMINE THE CREDIBILITY OF ANY GIVEN WITNESS AT TRIAL."**

Therefore, when **false evidence, or false testimony** is presented by the State, it usurps the authority of the jury, and bends the credibility to the will of the Prosecution.

[continuing in **Napue**] - "it is of no consequence that the **falsehood** bore upon the witness' credibility rather than directly upon defendant's guilt.

**A LIE IS A LIE,
NO MATTER WHAT ITS' SUBJECT,**

and, if it is in any way relevant to the case ...

**THE DISTRICT ATTORNEY HAS THE RESPONSIBILITY AND DUTY
TO CORRECT WHAT HE KNOWS TO BE FALSE AND ELICIT THE TRUTH...**

That the District Attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

**Mooney vs. Holohan**, 294 US 103 (S.Ct. 1935);

"It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has **contrived a conviction through the pretence of a trial** in which truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the **presentation of testimony known to be perjured**. Such a contrivance by a State to procure a conviction and imprisonment of a defendant is as

inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. And the action of prosecuting officers on behalf of the State, like that of administrative officers in the execution of its laws, may constitute state action within the purview of the Fourteenth Amendment. That Amendment governs any action of a State, 'whether through its legislature, through its courts, or through its executive or administrative officers." **Carter vs. Texas**, 177 US 442, 447, 44 L.Ed. 839, 841, 20 S.Ct. 687; **Rogers vs. Alabama**, 192 US 226, 231, 48 L.Ed. 417, 419, 24 S.Ct. 257; **Chicago B. & Q.R. Co. vs. Chicago**, 166 US 226, 233, 234, 41 L.Ed. 979, 983, 984, 17 S.Ct. 581.

## THE DEFENDANT HAS AN OBLIGATION TO DEMONSTRATE A DENIAL OF DUE PROCESS: "

The FBI Agents in the case, Joseph Noone and Larry Whitehead did cooperate and conspire with Informant Kevin Reardon, to modify,alter, create live handgrenades, placed them in locations, [346 Scott Street and Storage Unit #315], Informant Kevin Reardon held access to, then lie to Magistrate Mannion about probable cause <u>to search for the very grenades that they **planted as 'evidence' to entrap this Petitioner**</u>.

**Almeida vs. Baldi**, 195 F.3d 815 (CA3 1951);

"In **Bute vs. People of State of Illinois**, 333 US 640, 649, 68 S.Ct. 763, 768, 92 L.Ed. 986, Mr. Justice Burton said that due process under the Fourteenth Amendment '***has reference rather to a standard of process that any cover many varieties of processes that are expressive of differing combinations of historical modern, local or other judicial standards, provided that they do not conflict with the 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions***'." We think that the conduct of the [State] as outlined in the instant case is in conflict with our fundamental principles of liberty and justice. The suppression of evidence favorable to [Petitioner] was a denial of due process."

Therefore the showing requirement of **Napue** has been clearly shown by this Petitioner in Court Documentation by the withholding of this evidence through the use of <u>**false testimony, and false evidence that**</u> <u>**was presented to the Court, in warrant issuance(s), Grand Jury Indictment**</u> <u>**and more**</u>.

[continuing in **Almeida**] - "In **Pyle vs. Kansas**, 317 US 213, 216, 63 S.Ct. 177, 178, 87 L.Ed. 214, the Supreme Court of the United States said that

allegations of '**perjured testimony**, knowingly used by the State authorities to obtain (a) conviction, and ***

**the DELIBERATE SUPPRESSION by those same authorities of evidence favorable to (a defendant)**

***sufficiently charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven,

WOULD ENTITLE (HIM) TO RELEASE FROM HIS PRESENT CUSTODY.

**Mooney vs. Holohan**, 294 US 103.


The decision cited is the controlling authority. It has been such for seventeen years."

In addition to the **planted 'evidence' of live grenades** at both 346 Scott Street and Storage Unit #315, Informant Kevin Reardon also, [as proven through the FBI TRACE OF EMAILS TO 346 SCOTT STREET, Nov. 10-16th 2005, New York Nov. 21-23rd, 2005], using Petitioner's passwords on his old email accounts, since -

**KEVIN REARDON KNEW THE PASSWORDS OF PETITIONER'S ACCOUNTS SINCE 2000, WHEN PETITIONER HAD STAYED AT INFORMANT KEVIN REARDON'S HOUSE IN NEW YORK, 1/2 A BLOCK FROM JOYCE REYNOLDS HOUSE, SAVED ON KEVIN'S COMPUTER.**

The 'DELIBERATE SUPPRESSION, BY THOSE SAME AUTHORITIES OF EVIDENCE FAVORABLE TO (A DEFENDANT)', the withholding since 2010 by US Attorney Peter J. Smith of File #10-3813, stating the above facts.

The 'allegations' of perjured testimony are not mere allegations, but facts proven by EXHIBITS:

1) Larry Whitehead perjured about the 1978 New York 4th Degree Attempted Arson misdemeanor offense he claimed as felonious to 'back up' the 'terrorist theme' of this matter.

2) Larry Whitehead did perjure about the Nov. 10-11th, 2005 "lock change", para #35 and #37 in the Affidavit of Probable Cause, in order to make a falsified veracity test for informant Kevin Reardon, whom he knew to be lying under oath.

3) Joseph Noone lied to Magistrate Mannion about the April 23rd, 2005 grenade, **which was never a 'live' grenade, thus never was a criminal offense** -

**THUS WAS NOT AN ARRESTABLE OFFENSE, WHICH PENNSYLVANIA STATE KNEW, REFUSED ANY WARRANT ISSUANCE, AND EVEN INFORMED THE FBI THAT NO CRIME HAD OCCURRED ON APRIL 23rd, 2005.**

4) Joseph Noone lied to the Grand Jury,, telling them the April grenade was 'detonated', when he knew it to be inactive and was **'disposed of in a scrap pile.'**

5) Joseph Noone did lie at trial, swearing to a 'confession' by this Petitioner to a threat to the **Standard Oil Company of Perth Amboy, NJ**, a place that has not existed since 1932.

)

Has there been an incident at trial or plea, wherein
false statements or fabricated evidence was given,
that affected the outcome, and thus tainted the
"CONFIDENCE IN THE VERDICT" OBTAINED ?

<u>Youngblood vs. West Virginia</u>, 547 US 867 (S.Ct. 2006):

'A <u>Brady</u> violation occurs when the government fails to disclose
evidence materially favorable to the accused. See: 373 US @87, 83 S.Ct.
1194, 10 L.Ed.2d 215. This Court has held that the <u>Brady</u> duty extends to
impeachment evidence as well as exculpatory evidence, <u>US vs. Bagley</u>, 473
US 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (S.Ct. 1985), and <u>Brady</u>
suppression occurs when the government fails to turn over the evidence
that is "known only to police investigators and not to the prosecutor,"
<u>Kyles</u>, 514 US @438, 115 S.Ct. 1555, 131 L.Ed.2d 490. See: ID @437, 115
S.Ct. 1555, 131, L.Ed.2d 490 ("<u>[T]he individual prosecutor has a duty to
learn of any favorable evidence known to the others acting on the
government's behalf in the case, including the police</u>"). 'Such evidence
is material "if there is a reasonable probability that, had the evidence
been disclosed to the defense, the result of the proceeding would have
been different,'" <u>Strickler vs. Greene</u>, 527 US 263, 280, 119 S.Ct. 1936,
144 L.Ed.2d 286 (S.Ct. 1999)(quoting <u>Bagley</u>, supra, @682, 105 S.Ct. 3375,
87 L.Ed.2d 481 (opinion of Blackmun, J.));

Prosecution knew prior to any Affidavit of Probable Cause, that Informant Kevin
Reardon did <u>plant as entrapment evidence one live handgrenade at 346 Scott Street
on April 23rd, 2005.</u> Prosecution knew that Informant Kevin Reardon did <u>plant as
entrapment evidence a second live handgrenade at Storage Unit #315, in Petitioner's
toolbox.</u> Prosecution knew that Informant Kevin Reardon lied in his Affidavit
statement of the 1978 New York incident, a 4th Degree Attempted Arson count, a
misdemeanor offense. There were no 'explosives', nor any 'wired to explode when a
garage door was opened.* The Prosecutor knew that Informant Kevin Reardon did send
and receive the Nov. 10-24th, 2005 emails they charged against this Petitioner.

[continuing in <u>Youngblood</u>] - although a "showing of materiality does not
require demonstration by a preponderance that disclosure of the suppressed
evidence would have resulted ultimately in the defendant's acquittal,"
<u>Kyles</u>, 514 US @434, 115 S.Ct. 1555, 131 L.Ed.2d 490. <u>The reversal of a
conviction is REQUIRED</u> upon a '<u>showing that the favorable evidence could
reasonably be taken to put the whole case in such a different light as
to UNDERMINE CONFIDENCE IN THE VERDICT</u>.' "

There is no question, given the evidence withheld the defense, listed
above, that the outcome would have been altered, and that there exists no
confidence in the verdict previously obtained without that evidence.

In Napue vs. Illinois, 360 US 264 (S.CT. 1959);

"First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, Mooney vs. Holohan, 294 US 103, 79 L.Ed. 791, 55 S.Ct. 340, 98 ALR 406; Pyle vs. Kansas, 317 US 213, 87 L.Ed. 214, 63 S.Ct. 177; Curran vs. Delaware, (CA3 Del) 259 F.2d 707. See: New York ex. rel. Whitman vs. Wilson, 318 US 688, 87 L.Ed. 1083, 63 S.Ct. 840, and White vs. Ragen, 324 US 760, 89 L.Ed. 1348, 65 S.Ct. 978. Compare: Jones vs. Kentucky, (CA6 Ky) 97 F.2d 335, 338, with Re Sawyer's Petition, (CA7 Wis) 229 F.2d 805, 809. Cf. Mesarosh vs.  US, 352 US 1, 1 L.Ed.2d 1, 77        S.Ct. 1, 9. -

There is no question of the fraud, especially in light of the constructive amendment, the charge of Indictment to §5845, and the sentence to a §922(g)(1), 'Felon in possession of a firearm,' which Petitioner is no prior felon. The PSI, **altered by the FBI, since it has been proven the NCIC is under FBI control, the** "Two Counts - 1995 - Litchfield County - 'Assaults on Police Officers,' which never took place. There was never an arrest, conviction, and certainly no sentence. What question is there of a tainted crime scene, when Informant Kevin Reardon was in both 346 Scott Street and Storage Unit #315, **EIGHT DAYS PRIOR TO April 23rd, 2005 search, and EIGHT MONTHS PRIOR to the Dec. 5th, 2005 search.**

[continuing in Napue] - The same result is obtained when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Alcorta vs. Texas, 355 US 28, 2 L.Ed.2d 9, 78 S.Ct. 103; US vs. ex. rel. Thompson vs. Dye, (CA3 Pa) 221 F.2d 763; US ex. rel. Almeida vs. Baldi, (CA3 Pa) 195 F.2d 815, 33 ALR2d 1407; US ex. rel. Montgomery vs. Ragen, (DC Ill) 86 F.Supp. 382. See: General Annotation - 2 L.Ed.2d 1575.

The government, embodied within the office of the Prosecution, did not correct the false evidence to be presented to the Grand Jury, which resulted in an illegal indictment, to which the Petitioner should never have been exposed.

It doesn't take a Rocket Scientist to calculate that Kevin **planted both live handgrenades, sent the emails from 346 Scott Street, [where FBI TRACED them], and** when most of that evidence resides within File #10-3813, and it also states that Kevin Reardon **removed from 346 Scott Street, a duffle bag containing three of the inert handgrenades, two pineapple-types, and one Chinese design.** Now, two of the Pineapple-type grenades show up...where do you think they came from??

[continuing in Napue] - The pricipal that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.

Now, look again at [**EXHIBIT 1**] - Property of **DANIEL REYNOLDS** - **DUFFLE BAG WITH THREE GRENADES**, M16 clips and more.

Look at [**EXHIBIT 5a**] - the bomb dog on April 23rd, 2005 - Finds **TWO** bombmaking areas in the 346 Scott Street house, **but NO DUFFLE BAG WITH THREE GRENADES**.

How does a trained bomb detection dog not scent a **DUFFLE BAG** that has to contain gunpowder residue, since it had previously held twelve - twenty M16 clips that were kept in it ??

**IT DID NOT MISS IT, IT WAS ALREADY REVOVED BY INFORMANT KEVIN REARDON PRIOR TO APRIL 23rd, 2005's SEARCH.**

Ask yourself these more obvious question:

**WHAT IS MISSING FROM THIS CASE IN EVIDENCE ?**

1) **NO FINGERPRINTS TAKEN BY THE FBI OFF PETITIONER'S TOOLBOX ??**

A toolbox that Petitioner had used for years held no fingerprints of Petitioner ?

Because they had been wiped off **prior** to Dec. 5th, 2005 hoping for new prints, but Petitioner did not touch the toolbox on Nov. 10th, 2005.

2) **NO PHYSICAL EVIDENCE OF ANY SENT/RECEIVED EMAILS WERE FOUND ON PETITIONER'S DESKTOP COMPUTER HARDDRIVE.** [**EXHIBIT 4**]

[But why would there be any evidence since there was not any computer monitor on that Desktop computer **prior** to Nov. 23rd, 2005 anyhow ?]

[**EXHIBIT 3**] states that the **FBI TRACED ALL PENNSYLVANIA EMAILS TO 346 SCOTT STREET**, where informant Kevin Reardon was.

3) **GET THE FBI GRENADE PHOTO GRAPH AND DESTRUCTION REPORT ON GRENADE #2, then ask yourself:**

A) How did that grenade get rusty ??

    (i) Within a toolbox full of oil-covered tools, the only other liquid in that box a full bottle of Power Brake Fluid -

    [For those unfamiliar with the rust-removing properties of Power Brake Fuid, it is used as a stripper].

    (ii) How then did the grenade get wet in order to have rusted ??

B) On the destruction report -

    (i) The grenade fuse would not light with an electric match - **IT WAS TOO DAMP TO LIGHT !**

    (ii) The grenade fuse would not light with a hotter match - **IT WAS TOO DAMP TO LIGHT !**

### (iii) HOW DID A GREEN, WAXED FUSE GET SO WET THAT NEITHER MATCH WOULD MANAGE TO LIGHT IT ??

**C)  Why are there no fingerprints on this grenade ??**

Have you ever worked with fireworks gunpowder, or reloading powder ? It's **black, ultra-fine, and it gets all over everything it touches.**

Informant Kevin Reardon, as Attorney Philip Gelso will tell you, altered the grenades by taking the gunpowder from the brick, (there are 2500 firecrackers in a brick, **Daniel Reynolds left a brick of firecrackers at the house, [which coincidentally had a green, waxed fuse on it that now appears in the grenades]**), filling the grenades with that gunpowder, adding the green waxed fuse.

However, here is the problem: You have these grenades, now they are covered with a fine black powder that would make a fingerprint expert happy, all over the outside of the grenades –

**THAT KEVIN HAD JUST HELD, THUS HAD HIS PRINTS ALL OVER THEM !** How do you remove them? Well, not knowing any better, you would wash them just as Informant Kevin Reardon did. However, Kevin, clearly no gunpowder using party, instead of merely wetting a cloth and rubbing the black, fingerprint-holding powder off the grenades, submerged them. The water got into the **cotton-cored center of the green waxed fuse, DAMPENING IT.**

Note the grenades have what the Government aptly calls, a 'pineapple' pattern in the metal jacket. The grooves are deep, about an eighth of an inch. Water remained in the grooves, the grenade got warm in the summer heat, [the Storage Unit averages about 100-120 degrees in August, there is no fans or air-conditioning], the water made the iron 'pineapple' jacket of the grenade rust. Attorney Philip Gelso figured this out back in 2006.

Informant Kevin Reardon spent **eight days in the house at 346 Scott Street, and Storage Unit #315, PRIOR TO THE SEARCH** –

With **TWO** bombmaking areas –

Three grenades in a DUFFLE BAG

[Which he removed PRIOR to the    April 23rd, 2005 search] –

A room full of tools to work with –

A brick of firecrackers' worth of gunpowder with a green waxed fuse –

Keys and access codes to both locations –

Informant Kevin Reardons' wife "discovers" one altered handgrenade in the very first room that he picks for her to pack up, another altered grenade is "discovered" by the FBI, [who, along with Kevin Reardon, had **planted the grenade in the first place**], and the **DUFFLE BAG** comes up missing. Maybe the bomb dog should be deployed to Kevin's house ?

**THERE IS OF COURSE, THE THIRD CHINESE HANDGRENADE
THAT WAS IN THE DUFFLE BAG THAT INFORMANT
KEVIN REARDON HAD REMOVED FROM 346 SCOTT STREET
PRIOR TO THE STATE'S APRIL 23rd, 2005 SEARCH.**

Or should it be mentioned that this 'Government witness' to the handgrenade "discoveries" that he himself planted with FBI approval, had, in April, 2005 -

**THREATENED TO HAVE THIS VERY PETITIONER ARRESTED IF HE
EVER RETURNED TO THE UNITED STATES TO VISIT HIS MOTHER,
[WHOM THE PETITIONER HELD POWER-OF-ATTORNEY OVER SINCE
1990, WHEN MILLARD LEE REYNOLDS DIED, AND PETITIONER
BECAME JOYCE REYNOLDS' CARETAKER]**

**STRANGE HOW PETITIONER WAS ARRESTED WITHIN TWO WEEKS OF RETURNING TO THE
UNITED STATES AND VISITING JOYCE REYNOLDS...**

Or shall we also consider the [**EXHIBITS 8-11**], which shows that the FBI falsified Petitioner's PSI Report, by the addition of the two false "Assaults upon Police Officers, 1995, Litchfield, CT," neither of which ever took place.

There is the legal approach, which states that this Petitioner -
A)   Could not be convicted under 18 U.S.C. §842(p)(2), since **Hull**, (3rd Cir. 2006), predated the conviction of Petitioner, and stated that no conviction could occur upon 'possession of explosives, absent some use.' Of course our 'possession', from, in grenade #5, 9000 miles away, and, in grenade #2, 3000 miles away, is absurd to begin with. But 'use' from either is just insanity to consider.
B)   An 18 U.S.C. §922(g)(1) charge has less legal standing, since this Petitioner was never indicted under that clause, but under 18 U.S.C. §5845, and Judge Kosik constructively amended the indictment to the 18 U.S.C. §922(g)(1) charge, but used the falsified 1995 "Assaults" as the predicate felony offense element. There is no prior felonies, in fact, has anyone missed the more obvious fraud in that ??

**HOW IS THERE, IN 2005 or 2007, if you prefer, ...
ABSOLUTELY NO POINTS GIVEN, IF IT WERE A REAL CHARGE --**

Does anyone really believe that the FBI, Probation, and the Courts, <u>**ALL MISSED THE FACT THAT THE PSI, WITH A TEN-YEAR OLD FELONY OFFENSE -**</u>

<u>**HAD ZERO PRIOR CRIMINAL HISTORY POINTS ON IT ???**</u>

[Noting that the Sentencing Guidelines Chart states -

Category 2, (which Petitioner, with a felony conviction in 1995 would have, <u>**3 points**</u>), is not where the sentence placed him, but in Category 1, (<u>**0-1 points**</u>)].

So, as the [<u>**EXHIBIT 10**</u>] states, and [<u>**EXHIBIT 11**</u>] confirms, this Petitioner never had any 1995 Assault Felonies, as the first is a confirmation by the Litchfield Court itself that no arrest or conviction ever took place there, AND the other, final confirmation, by the Washington Office of the FBI -

**THAT NO CONVICTIONS OF ANY TYPE EVER OCCURRED WITH THIS PETITIONER ANYWHERE IN THE UNITED STATES IN 1995 !!**

Fraud then, is not a question, but a fact, in legal simple terms - Case #17-cv-0124, Clarksburg, WV was, in the Original Brief, given these same questions to the Government, with a Court-directed order to respond and deny the claims of Actual Innocence of this Petitioner, and...

**THE GOVERNMENT FAILED TO DENY ANY OF THE CLAIMS AT ALL -** WHICH - Under Federal Rules of Civil Procedure, **Rule 8(B)(6)**, means... - <u>**Failure to Deny**</u> - The failure to deny any claim makes the facts that are in that claim <u>**admitted as true**</u>.

Thus, the Government has already admitted that the facts, fraud, did occur herein, the FBI did <u>**plant the grenades as entrapment**</u> <u>**evidence with Informant Kevin Reardons' assistance, and all PA emails**</u> <u>**from Nov. 10-16, 2005 were TRACED TO WHERE INFORMANT KEVIN REARDON HELD**</u> <u>**THE ACCESS TO, 346 SCOTT STREET**</u>.

<u>**THUS THIS PETITIONER WAS, AND REMAINS ACTUALLY INNOCENT**</u> <u>**OF ALL CHARGES ON HIS RECORD SINCE 1995, INCLUDING**</u> **ALL 2005-2007 CHARGES THE FBIA FALSIFIED AGAINT HIM.**

While considering the falsification of the PSI Report, think about this: The [<u>**EXHIBIT 9**</u>] states the first of the 'two Assaults on Police Officers' was in June 1995 and the sentence was served as 90 days jail time. However, when questioned, the FBI could not furnish the name of any jail this was served within, nor could they produce the Petitioner's Connecticut State Identity Number used to incarcerate him.

Ridiculous, due to the fact that Connecticut uses the Social Security Number for each inmate, and the Prosecution, as well as the FBI both hold documentation, the Court Documents from the 1978 New York 4th Degree Attempted Arson Misdemeanor charge being unquestionable proof, [F.R.Evid §201(c)(2) Judicial Notice material], that number being 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.

WHY DIDN'T THE FBI AND PROSECUTION KNOW THIS INFORMATION, SINCE THE FBI "INVESTIGATED" THE PETITIONER'S "CRIMINAL HISTORY", AND THE PROSECUTOR HAS 'AN INDEPENDENT DUTY TO SEPERATE INVESTIGATION OF ALL POLICE INFORMATION PROVIDED HIM'

Because there never was any arrest, any conviction, nor sentence served due to the non-existence of any crime in the first place, [EXHIBIT 11].

But, if there had been any crime at all, arrest and conviction with sentence, as stated in the PSI and [EXHIBIT 9], to "90 days since June 1995" -

HOW WAS THIS PETITIONER IN WEST PALM BEACH, FLORIDA, ON AUGUST 29th, 1995, WHEN THE JAIL "TERM" DID NOT EXPIRE UNTIL SEPTEMBER, 1995 ???

Because Petitioner was never in jail to begin with.

## CONCLUSION

Petitioner was entrapped by the FBI, who cooperated with Informant Kevin Reardon, who altered and planted as evidence, two live grenades, one at 346 Scott Street and one at Storage Unit #315, then sent and did received emails using Petitioner's AOL accounts and falsified Yahoo accounts from the FBI TRACED location of 346 Scott Street and his own home in Binghamton, New York. Petitioner was and remains, Actually Innocent, was and it remains physically impossible for Petitioner to have sent and received emails while in Pennsylvania and New York, as the desktop computer had no computer monitor on it. The email TRACE BY FBI TO 346 SCOTT STREET EXONERATES THIS PETITIONER.

## REMEDY SOUGHT

Petitioner desrves immediate release with expungement of all charges on any record whatsoever, since the falsified 1995 through 2007 charges, proven herein.

I, Michael Curtis Reynolds hereby certify under penalty of perjury pursuant to Title 28 U.S.C. §1746 the aforesaid to be true and correct.

1/26/18
Date

Signature

## Michael Reynolds Report of Daniel Reynolds Theft's

REYNOLDS brother DANIEL VICTOR REYNOLDS, date of birth 01/02/1957, social security account number 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, who spent eleven years between the Army and the National Guard, went AWOL during DESERT STORM. The Army decided not to prosecute him and instead gave him a dishonorable discharge from the military. REYNOLDS stated that in 2002, his brother DANIEL REYNOLDS moved in with REYNOLDS, his mother Joyce Reynolds, and his son Justin Reynolds at 346 Scott Street, Wilkes-Barre, Pennsylvania.

REYNOLDS brother DANIEL was previously a Military Policeman at Fort Campbell, Kentucky. During his tour of duty at Fort Campbell he was accused of aiding a group responsible for stealing ammunition and supplies from the military base. DANIEL was dealt with internally in an administrative manner.

REYNOLDS physically observed his brother DANIEL in possession of M-16 clips with blanks, 500 rounds of SS109 armor piercing ammunition, and three dummy grenades. REYNOLDS stated that his brother brought the clips, ammunition, and dummy grenades to 346 Scott Street, Wilkes-Barre along with his personal belongings. DANIEL REYNOLDS also possessed mechanic's tools which were stolen from the military. DANIEL owned a black Nissan Pathfinder with Connecticut Registration. DANIEL REYNOLDS left 346 Scott Street, Wilkes-Barre, PA in 2004 and moved to Indiana.

## Debra Reardons Letter about Daniel Reynolds

Mike,

Mom sends her love, and misses you awful. Was wondering if it is still a possibility that they let you out under home arrest. Also mom said the hand grenades were Danny's and the calls for terrorism weren't yours. Who then do we call and what do we do to get this information to the courts.

Sorry they changed your visitation days. We did try to see you on mom's birthday. Hang in there. We all want you home.

Love always,

Deb

## Tammy Anderson's Statement about Daniel Reynolds

ANDERSON described MICHAEL'S older brother DANNY REYNOLDS as "a sleaze", he stole a jeep, was in the military, spent time in Levenworth Prison, married 4 or 5 times, and also spent time in Korea. MICHAEL was brainier than DANNY.

EXHIBIT 1

## OFFICER KUPETZ PROVIDED THE FOLLOWING INFORMATION:

Officer Kupetz recalled that Reynolds' brother-in-law  was cleaning out Reynolds' residence when a **grenade** **fell** **out** **of** **a** **duffel** **bag** along with other possessions belonging to Reynolds.

## MICHAEL REYNOLDS" STATEMENT OF THE GRENADES

Reynolds brother DANIEL VICTOR REYNOLDS, date of birth 01/02/1957, social security number 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, who spent eleven years between the Army and the National Guard, went AWOL during Desert Storm. The Army decided not to prosecute him and instead gave him a dishonorable discharge from the military. Reynolds stated that in 2002, his brother DANIEL REYNOLDS moved in with Reynolds, his mother Joyce Reynolds, and his son Justin Reynolds at 346 Scott Street, Wilkes-Barre, Pennsylvania.

Reynolds brother DANIEL was previously a Military Policeman at Fort Campbell, Kentucky. During his tour of duty at Fort Campbell he was accused of aiding a group responsible for **stealing ammunition and supplies from the military base**. DANIEL was dealt with internally in an administative manner.

REYNOLDS physically observed his brother DANIEL in possession of M-16 clips with blanks, 500 rounds of SS109 armor piercing ammunition, and **three dummy grenades**. Reynolds stated that his brother brought the clips, ammunition, and **dummy grenades** to 346 Scott Street, Wilkes-Barre along with his personal belongings. DANIEL REYNOLDS also possessed mechanics tools which were stolen from the military. DANIEL owned a black Nissan Pathfinder with Connecticut Registration. DANIEL REYNOLDS left 346 Scott Street, Wilkes-Barre, PA in 2004 and moved to Indiana.

## DEBRA REARDONS' LETTER ABOUT GRENADES, EMAILS

Mike,

Mom sends her love, and misses you awful, Was wondering if it is still a possibility that they let you out under home arrest. **Also Mom said the hand grenades were Danny's and the calls for terrorism weren't yours.** WHO THEN DO WE CALL AND WHAT DO WE DO TO GET THIS INFORMATION TO THE COURTS.

Sorry they changed your visitation days. We did try to see you on Mom's birthday. Hang in there. We all want you home.

Exhibit 5

RECEIVED
NOV 9 - 2010
OFFICE OF THE CLERK
SUPREME COURT, U.S.

JOSEPH NOONE: Called as a witness, being first duly sworn according to law, was examined and testified as follows:

Y MR. GURGANUS:

Q. All right. Please introduce yourself to the Grand Jurors.

A. Joseph F. Noone, Special Agent with the FBI in Scranton, Pennsylvania here.

Q. I want to direct your attention to an investigation that you were involved in of Michael Curtis Reynolds. Can you tell the Grand Jurors how it is that you became involved in that investigation?

A. First of all, I work terrorism matters out of the Scranton office, terrorism investigations. But on November 18th, 2005 our office received a telephone call from Montana FBI office advising us that there was an individual communicating via Internet to a possible, what he believed to be a possible terrorist group. They searched the IP address and it was traced back to 346 Scott Street, Wilkes-Barre, Pennsylvania. That is why they were forwarding information to us. At this time we didn't know where the subject was, but the IP address was traced back to that address.

Q. When you say the "IP address", what do you mean by

MAILS TRACED TO HERE ↑↑

---

**But Petitioner was here**

↓ ↓ ↓

RECEIVED
NOV 9 - 2010
OFFICE OF THE CLERK
SUPREME COURT, U.S.

3-302 (Rev. 10-6-95)

FEDERAL BUREAU OF INVESTIGATION

Date of transcription 12/09/2005

On December 7, 2005, Special Agent (SA) Larry J. Whitehead, Federal Bureau of Investigation (FBI), and Trooper Thomas Bachman, Pennsylvania State Police (PSP), returned to the RED CARPET INN located at 400 Kidder Street, Wilkes Barre, Pennsylvania, telephone number 570-821-2177, to re-interview the motel manager, RAY VEGA, regarding MICHAEL C. REYNOLDS.

Investigators asked VEGA if he was certain he recognized the photograph of REYNOLDS as the individual who stayed at the motel and again VEGA stated he was certain. Investigators asked VEGA to manually search the motel handwritten records for any record of REYNOLDS by his name or his alias of MICHAEL C. YETY. VEGA provided the November 2005 handwritten "Check In Sheets" to investigators to search for either name. SA Whitehead searched the records and located REYNOLDS' name written on the November 10, 2005 "Check In Sheet". The record revealed that REYNOLDS checked in on November 10, 2005, paid cash for the room in the amount of $194.25, and was assigned room 173. The record additionally revealed that REYNOLDS checked out from the motel on November 17, 2005.

VEGA provided copies of the "Check In Sheets" from November 10, 2006 through November 16, 2005 which will be maintained in an FD-340.

At approximately 7:00 p.m., SA Whitehead telephonically contacted VEGA to determine if the motel owner, KIRAN PATEL, would agree to consent to a forensic search of the non-functioning computer. VEGA stated he contacted PATEL after investigators left and PATEL agreed to provide the infected computer to investigators in an attempt to extract the corrupted information from the computer.

ADMINISTRATIVE NOTE

SA Joseph F. Noone, FBI, recovered a receipt for the RED CARPET INN from REYNOLDS at the time of REYNOLDS arrest in Pocatello, Idaho. The receipt was in the name of MIKE REYNOLDS, guest #3599, 400 Kidder Street, Wilkes Barre, Pennsylvania. The receipt showed that REYNOLDS checked in on 11/10/2005 and checked out on 11/17/2005, stayed in room 173. The receipt also provided the following ID: 4/6/58; 480553074.

| Investigation on | 12/06/2005 | at Wilkes Barre, Pennsylvania | | | Investigation on | 0 |
|---|---|---|---|---|---|---|
| File # | 315T-PH-100128-CRIM | | Date dictated | | File # | 315T-PH- |
| by | SA Larry J. Whitehead:ljw | | | | by | SA Larry |

---

Whitehe VEGA Stree hard dr order the har

Bachman, recently was inf contai managem GB har Consen drive. Form we 1095 Hi examinat hard dri

On examinat of the

On the fore Troope Report, Troope Computer Copy of Analysi forensi that RE maintai

On VEGA.

On

Case 3:05-cr-00493-VMJ Document 144 Filed 03/29/18 Page 18 of 33

Exhibit B

JOHN GURGANUS' REBUTTAL OF WITNESS COACHING CHARGE

AND JURISDICTIONAL ISSUE RAISED


Regardless, venue was entirely proper in this district. Under 18 U.S.C. Section 3237, any offense against the United States begun in one district and completed in another, or committed in more than one district may be prosecuted in any district in which the offense was begun, continued, or completed. Given the facts that Reynolds retrieved the computer integral to the commission of the offense in this district, sent emails as part of the crimes from this district,



Regardless, as noted above, prosecution of this case was entirely proper given Reynolds' continuation of the offenses while in this district which included sending emails to the person he believed a terrorist from his desktop computer while here.

JUSTYNA SACHARZEWSKA'S STATEMENT TO FBI, CONFIRMING THAT THIS DEFENDANT OWNED NO COMPUTER MONITOR WITH WHICH TO SEND ANY EMAILS FROM

SACHARZEWSKA advised she last saw REYNOLDS approximately three weeks ago on November 10, 2005, when REYNOLDS returned from Thailand. SACHARZEWSKA stated that REYNOLDS returned to the U.S. on November 9, 2005. SACHARZEWSKA gave her vehicle, 1989 red Dodge Shadow, to REYNOLDS as a gift. SACHARZEWSKA stated her vehicle was not in good condition and she was considering scrapping the vehicle. On November 15, 2005, SACHARZEWSKA and REYNOLDS went to a notary in Wilkes Barre Township, Pennsylvania (across from Wegman's Store) to transfer the vehicle title over to REYNOLDS. REYNOLDS brought his desktop computer to SACHARZEWSKA's residence and connected his computer to SACHARZEWSKA's monitor so he could access his computer hard drive.

KEVIN REARDON'S TESTIMONY AT TRIAL
" I know that he went with my wife to buy some computer equipment."

Exhibit (4)

ALLEGED EMAILS SENT FROM NOVEMBER 10-23, 2005

From : "fritz meuller"<homeapproach@yahoo.com>
Date:  Sun, 13 Nov. 2005
Subject: retirement
To: xxxxxxxxxxxxxxx@yahoo.com

FILED
SCRANTON

JAN 25 2011

PER _____ OT _____
DEPUTY CLERK

From: xxxxxxxxxxxxxxx@yahoo.com>
Date: Sun, 13 Nov. 2005
Subject: retirement
To: "Michael Reynolds"<longtermonly2@yahoo.com>

:xx

From: "fritz meuller"<homeapproach@yahoo.com>
Date: Sun, 13 Nov. 2005
Subject:   new email
To: xxxxxxxxxxxxxxx@yahoo.com>

From: "fritz meuller"<homeapproach@yahoo.com>
Date: Mon, 14 Nov. 2005
Subject: Rē:timing
To: xxxxxxxxxxxxxxx@yahoo.com>
(Court should note: how is there a Re:timing reply, minus the timing email?)

From: "fritz meuller"<homeapproach@yahoo.com>
Date: Mon, 15 Nov. 2005
Subject: Re:offended
To: xxxxxxxxxxxxxxx@yahoo.com>
(Court should note: how is there a Rē:offended reply, minus the offended email?)

ALL THESE EMAILS CLAIMED AS SENT BY PLAINTIFF, FROM 346 Scott Street, Wilkes-Barre, but Plaintiff was at 400 Kidder Street, without any computer monitor, thus any physical means with which to have sent these alleged emails, and was not at the scene of the crime.

From: "Michael Reynolds" <longtermonly2@yahoo.com>
Date: Mon, 21 Nov. 2005
Subject: needs
To: xxxxxxxxxxxxxx@yahoo.com>

From: xxxxxxxxxxxxxx@yahoo.com>
Date: Wed, 23 Nov. 2005
Subject:   (Court should note: where is the Subject line?)
To:      "Michael Reynolds" <longtermonly2@yahoo.com>

From: Militiapal2@aol.com
Date: Wed, 23 Nov. 2005
Subject: shopping
To: xxxxxxxxxxxxx@yahoo.com>

ALL THESE EMAILS CLAIMED SENT BY PLAINTIFF FROM NEW YORK, YET DEBRA REARDON TESTIFIED AT TRIAL THAT THERE WAS NO COMPUTER MONITOR TO DO SO.

Exhibit 6

Nov 24

10/15/07

To whom it may Concern,

On or about november 23rd, 2005 I took michael C Reynolds to the Salvation Army to purchase a computer monitor. As far as Internet service during his stay with our mother she does not own a computer nor does she have access to the internet through her telephone/television cable provider.

Time Warner Cable
483 Plaza Drive
Vestal, ny 13850
607-798-8001.

As far as using my Internet Access. Michael was not in my home during this time. From November 20 thru 24th 2005

Frances Martin-Childs
FRANCES MARTIN-CHILDS
Notary Public, State of New York
No. 01MA6072821
Residing in Broome C

Exhibit 7 - Deborah Pom...

## FRAUD EXHIBIT ADDENDUM

The Count 2, [changed to Count 6], §5845 'unregistered handgrenade' indicted for, was constructively amended to a §922(g)(1) at sentencing.

However, §922(g)(1) has a required element of a prior felont charge committed by the party. That prior felony was found in the challenged, but still used PSI, mentioned in **[EXHIBIT 1]**, herein, in an Expungement Motion to the Supreme Court of the state of Conecticut, two Counts of:

A) Two 'Assaults on Police Officers" in 1995, both clearly felony offenses, but when questioned, thus a transcript exists in the District Court, Prosecutor John Gurganus and Agent Noone failed to:

   (i) Prove which jail that Petitioner served this 'sentence' in.

   (ii) Prove Petitioner's Connecticut prisoner ID number for this jail term 'served'.

   (iii) Prove Petitioner's Connecticut Probation Officer's name and his location.

   (iv) Prove how the Petitioner happened to be in Florida for months if he was 'sentenced to jail term', and 'on probation' at the time in 1995.

And here is the most embarrasing part:

In Connecticut your <u>Social Security Number</u>, [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], is your State prisoner ID number, they do not issue separate numbers. Thus, we know that Gurganus and Noone never verified these charges, since in the transcripts arguing this pair of bogus charges, they could not reply to the question.

**[EXHIBIT 1]** is an Expungement Motion for these same charges, to the Litchfield County Courthouse. **[EXHIBIT 2]** is that Court's response: **THERE EXISTS NO SUCH CHARGES. [EXHIBIT 3]** is the Washington, DC FBI FOIA response. **THERE WERE NO CHARGES ANWHERE IN THE UNITED STATES IN 1995.**

The 18 U.S.C. §922(g)(1) charge on the conviction is based upon the <u>faked PSI assault charges</u> the Federal Agents, [FBI], placed in the NCIC software, since **EXHIBIT 2]** states the State Courts have no access to the NCIC to have written such charges on it.

**[EXHIBIT 3A]** is from a lawsuit wherein when sued in the Appeals Court, for a claim of false arrest and illegal search, since Count 1, [originally, then changed to Count 5, acquitted at trial]. The US Attorney Office **REFUSED TO REPRESENT THE FBI**, claiming:

**"IT IS NOT IN THE INTEREST OF THE UNITED STATES TO REPRESENT THEM."**

Exhibit 8

IN THE UNITED STATES SUPREME COURT

State of Connecticut

Michael Curtis Reynolds      ,                    CASE # _____

                    PETITIONER,

              VS.                          MOTION FOR EXPUNGEMENT OF

State of Connecticut        ,              CASE HISTORY BEFORE THIS COURT

                    RESPONDENT(S).

INTHAT, Petitioner requests that this Court EXPUNGE fully, from any and all permanent records, the charge(s) listed below, inclusive of local, State and Federal case-storage systems. That charge(s) [is/are]:

| DATE | DESCRIPTION | CHARGE NO. |
|------|-------------|------------|
| 06/1995 | Assault on Police Officer - 90 days Jail | |
| | Litchfield Township Court, 06759-0247 . | |
| | | |
| 06/1995 | Assault on Police Officer - 1 year probation | |
| | Litchfield Township Court, 06759-0247 | |
| | | |

Petitioner requests that this Court now EXPUNGE, for all time, the permanent records of the listed charge(s) above, and order that local, State and Federal Agencies also list the chage(s) as EXPUNGED.

A copy of the Court-sealed Order to EXPUNGE shall be given this Petitioner upon completion.

I, Michael Curtis Reynolds  hereby certfy under penalty of perjury pursuant to Title 28 U.S.C. §1746 the above as true and correct.

_____                    _____

Dated :                                    Signature

[EXHIBIT 9]



STATE OF CONNECTICUT
## OFFICE OF THE CLERK

SUPERIOR COURT

Robert C. Stearns Jr., Esq.
Assistant Clerk
Courthouse, P.O. Box 247, Litchfield, Connecticut 06759-0247

*E-mail:* Robert.Stearns@jud.ct.gov
Telephone: (860) 567-4120
Fax: (860) 567-4779

8 June 2017

Mr. Michael Curtis Reynolds
Reg. #10671-023
P O Box 6000
FCI Gilmer
Glenville, WV 26351

Re: Your letter of June 1, 2017

Dear Mr. Reynolds:

We have no record of a conviction for you in this this district. The Name you gave us and the dates given do not match any of our records. We have no direct connection with the NCIC data. We don't know where the information came from, but it didn't come from here and there is nothing we can correct.

Sincerely,

Robert C. Stearns, Jr
Assistant Clerk

[EXHIBIT **10**]
*An Equal Opportunity/Affirmative Action Employer*
www.jud.ct.gov



Exhibit 4

U.S. Department of Justice

Office of Information Policy

Telephone: (202) 514-3642          Washington, D.C. 20530

FEB 0 3 2010

Mr. Michael Reynolds
Register No. 10671-023
United States Penitentiary          Re:    Appeal No. 2010-0797
Post Office Box 3000                         Request No. 1133267
White Deer, PA  17887                       ADW:MJS

Dear Mr. Reynolds:

You appealed from the action of the Federal Bureau of Investigation on your request for access to certain records pertaining to yourself, specifically "arrests, convictions and sentences in 1995."

After carefully considering your appeal, I am affirming the FBI's action on your request. To the extent that your request seeks access to records that would either confirm or deny an individual's placement on any government watch list, I am affirming the FBI's action in refusing to confirm or deny the existence of any such records responsive to your request. The FBI properly refused to confirm or deny the existence of such information because such information, if it exists, is protected from disclosure under the Freedom of Information Act pursuant to:

5 U.S.C. § 552(b)(2), which concerns matters that are related solely to internal agency practices; and

5 U.S.C. § 552(b)(7)(E), which concerns records or information compiled for law enforcement purposes the release of which would disclose techniques and procedures for law enforcement investigations or prosecutions.

This response should not be taken as an indication that records do or do not exist. Rather, this is the standard response made by the FBI.

As to any other records, the FBI informed you that it could locate no files responsive to your request. I have determined that the FBI's response was correct and that it conducted an adequate, reasonable search for records responsive to your request.

As part of the 2007 FOIA Amendments, the Office of Government Information Services (OGIS) was created to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. You may contact OGIS in any of the following ways:

Exhibit 11

## EXHIBIT EXPLANATIONS :

PAGE NO.                    DESCRIPTION

1         Rule 36 Admissions of Fact in an Actual Innocence filing;
          [case #17-cv-0124, Clarksburg, WV.].

2         More Rule 36 Admissions of Facts, same Actual Innocence case.
          Served on FBI Agents Noone and Whitehead, sent to FBI Director
          Robert Mueller, never denied.

3         Ola Whitebread's Recantation of her Trial Testimony, admission
          to being coerced into her statements by FBI.

4         Typed-for-clarity version of Ola's testimonial Recantation.
          Proof that [original Count 1, altered to Count 5] was not a
          'live grenade' thus was a non-criminal arrest charge. Count 1
          was the sole arrest charge on Dec. 5th, 2005.

5         FBI Agent Joseph Noone's Grand Jury lie. He knew that the
          April 23rd, 2005 handgrenade never functioned at all. It was
          '**discarded**' in a scrap pile.

6         Combo page of, on the left, the search on Dec. 12, 2005 of the
          computers of the Petitioner -

          **The Right-side is the Application for a Search Warrant, stating;**

          **'...your Affiant SEEKS AUTHORITY to search the computers...'**

          There existed no authority to search the computers on Dec. 12,
                              2005 at all.

7         The 'confession' claimed by FBI Agent Joseph Noone at trial,

          **of a "threat" to the STANDARD OIL CO., PERTH AMBOY, NJ...**

          **WHICH HAS NOT PHYSICALLY EXISTED SINCE THE 1930's !!!**

8         Telephone Transcript of Defense Attorney Joseph O'Brien, in
          which he admits everyone involved, the FBI, the Prosecutor,
          and himself knew that the case was a fraud. Never denied.

9         Our wonderful file #10-3813, wherein a lawsuit for False
          Arrest / Illegal Search, inwhich this file contains proof,
          again undenied in case #17-cv-0124, WV., stating that the

          **FBI AGENTS COOPERATED WITH INFORMANT KEVIN REARDON**
          **TO PLANT THE GRENADES AT 346 SCOTT STREET AND**
          **STORAGE UNIT #315, WHILE KEVIN HIMSELF SENT ALL THE**
          **EMAILS FROM PA IN THIS NOV. 10-16th, 2005, and**
          **ALL THE NEW YORK EMAILS NOV. 21-24th, 2005.**

          **See: Grand Jury testimony of : Joseph Noone, FBI,**

          **"emails were TRACED to 346 Scott Street."**

# Ola Whitehead's Testimony

Q.    Now, what did he say it was?

A.    He just said it was a grenade from when he was in the Army.

Q.    Did you ask him any questions about it?

A.    No, I wasn't really interested in it.

Q.    I'm going to show you Government Exhibit 100.13.

A.    Yeah, that's the one.

Q.    That appears to be what you saw?

A.    That is correct.

"I testified, Mike, it killed me to be up there and testify, but I had no choice. I want to explain, but I am too scared to at the same time. I don't know what I can and can't write and what I should and shouldn't write."

"They started to go over the possible questions. All were mostly about the grenade. I had no idea when I saw it, none. They told me to think back hard and I had to guess. When they mentioned times and dates, I didn't remember. So they said would you say it was in this timeline? I said maybe. And somehow it was decided it was before you left. I now know they tricked me into saying that time frame and I'm sorry but I still don't remember when I saw it or why I do know it was in the house. And no, I didn't know who's it was, but I remembered you telling me didn't remember who's. Now I remember clearly. ▮▮▮▮▮▮▮▮ you told me that."

"I did testify what I believed was the truth and or what I was made to believe was the truth. I would have done so much more different now today then that day. I testified, I'm so sorry. Everything was so intimidating and so scary. I didn't see till afterwards how clueless I was to everything around me. Monday night when I got the call to show up for 11 on tuesday, my life stopped. I was so scarde, scared of seeing you, scared of going there, scared of testifying, scared of looking you in the eye. I felt I was betraying you, but couldn't do anything about it."

## OLA WHITEBREAD'S TESTIMONY

"I testified, Mike, it killed me to be up there and testify, but I had no choice. I want to explain, but I am too scared to at the same time. I don't know what I can and can't write and what I should and shouldn't write."

They started to go over the possible questions. All were mostly about the grenade. I had no idea when I saw it, none. They told me to think back hard and I had to guess. When they mentioned times and dates, I didn't remember. So they said would you say it was in this timeline? I said maybe.

AND SOMEHOW IT WAS DECIDED IT WAS BEFORE YOU LEFT. AND NOW I KNOW THEY TRICKED ME, into saying that time frame and I'm sorry but I still don't remember when I saw it or why I was in the house. And no, I didn't know who's it was, but I remembered you telling me didn't remember who's. NOW I REMEMBER CLEARLY....IT WAS DANNY'S , YOU TOLD ME THAT.

I did testify what I believed was the truth and or what I was made to believe was the truth. I would have done so much more different now today then that day. I testified, I'm so sorry. Everything was so intimidating and so scary. I didn't see till afterwards how clueless I was to everything around me. Monday Night when I got the call to show up for 11 on tuesday, my life stopped. I was so scared, scared of seeing you, scared of going there, scared of testifying, scared of looking you in the eye. I felt I was betraying you, but couldn't do anything about it."

Ok, another one stating this was DANNY'S grenade, not Petitioner's, that makes four people, [in fact they had none testifying that it was this Petitioner's property], that told them, eight months before the Idaho arrest, that DANNY possessed the handgrenades. Yet they arrested this Petitioner.

## GRAND JURY TESTIMONY ON THE INDICTMENT FOR THIS ARREST

[Sgt. Cody Bergen, the Army Demolitions Expert who dismantled the device].

A.   No. There wasn't enough there to cause---.

The Prosecutor, John Gurganus, would not permit the end of that sentence to be heard by the Grand Jury, what was meant to be said was;

A.   No. There wasn't enough there to cause an explosion.

And this was said, as the US Attorney's Office stated on Direct Appeal; (Tr. 557-58). Not surprisingly, there being no testimony regarding the quantity of powder in the grenade or whether that quantity was sufficient to cause the grenade to explode, the jury acquitted Defendant of Count 5.

Because if the grenade is non-functional, it is a non-crime. As Sgt. Cody Bergen tried to tell the Grand Jury, the grenade, our arrest and search warrant basis grenade in all cases, "There wasn't enough there to cause and explosion." The SA Jospeh Noone knew eight months prior to this arrest and search that the crime was a non-criminal offense, if it had been the possession of Petitioner;

BUT HE ALREADY KNEW MONTHS BEFORE, THAT THE GRENADES WERE POSSESSIONS OF DANNY, NOT THIS PETITIONER.

EXHIBIT C

FEDERAL BUREAU OF INVESTIGATION

Date of Transcription 12/09/2005

On December 5, 2005, Special Agent (SA) Larry J. Whitehead, Federal Bureau of Investigation (FBI), received a two page facsimile from the 756th Ordinance Company. The facsimile was an Explosive Ordnance Incident Report, Unit Number 766-60-05, Control Number 63-39-05, dated April 23, 2005, regarding the detection of a MK II grenade at 346 Scott Street, Wilkes Barre, Pennsylvania. The report described the grenade as containing a small amount of black powder and a cannon fuse on the inside. The grenade was rendered safe and then discarded.

The report and facsimile cover sheet are attached and made part of this FD-302.

### Joseph Noone's Grand Jury Testimony of
### DECEMBER 20, 2005, AFTER THE ABOVE REPORT.

Q. I want to go through some of the matters that you have been investigating as soon as you encountered this case or started to investigate this case. First of all, can you tell the grand jurors your understanding of what happened on April 23rd, April 23rd, 2005 with a explosive device or destructive device that was found in Luzerne County. I believe you have testified to some of this, but you have also obtained some further evidence, is that right?

A. Yes. Excuse me. There was an explosive device found at 346 Scott Street, Wilkes-Barre, Pennsylvania and it was reported to the Wilkes-Barre City Police Department, Luzerne County Emergency Management Agency. The device was then safely detonated by Fort Indiantown Gap Bomb Squad.

Investigation on  12/05/2005  at Scranton, Pennsylvania      (via facsimile)

File #  315T-PH-100128-CRIM _____   Date dictated _____

by   SA Larry J. Whitehead:ljw

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



FILED
SCRANTON
DEC 10 2010
PER_____
DEPUTY CLERK

Page 1 of 1

Electric watch construction

wooden
popsicle stick

stereo
wires

hot
glue

This document, given to Attorney #1, Isabell Williams gave this to Petitioner on December 15, 2005, at the only meeting she had with Petitioner before she was terminated.

This document, taken from Petitioners computer, has been uploaded to another computer prior to printing. Meaning this was taken from that computer prior to the date below.

Note the computer path of the document, it states it is from Drive E. That computer has no Drive E. It has only a Drive C:, proving this was sent to another computer first, then printed out. The problem is what date it was printed out, on This date preeceded the issuance of the search warrant by nine days. Clearly a violation under the Fourth Amendment.

file://E:\Export\_00000FTK\_81000FTK\electric match[95578].JPG
12/12/2005 3:30PM          12/12/2005 3:30 PM

So, how did the right-hand side Search Warrant issue on 12/21/2005, but the Search place prior to 12/12/2005, in order to print this picture, and remains legal???

EXHIBIT PAGE 5

FILED
SCRANTON
JAN 25 2011
PER_____
DEPUTY CLERK

FOURTH AMENDMENT SEARCH WARRANT BREECH

In the following documents, mentioned within the Brief, and enclosed in the original Sept. 2007 Brief, is the document drawings, from the computer seized on Dec. 5th, 2005, actually, computers, as there were two of them, a desktop, and a german laptop. The original warrant declared "a computer". This created a problem, as it is not particular enough to say which computer under the requirements for a search warrant. Thus, the Government needed permission to search both computers to get what they, 'suspected' was on them. The issue and legal problem is, that the Government had already uploaded the Hard Drive, C:, from the Petitioner's computer, to a Drive E:, on another.

Conclusion

10. Your affiant believes, based upon the information above, including the information identified in FBI Agent Larry J. Whitehead's Master Affidavit that has has been incorporated by reference, there is probable cause to believe that evidence, fruits, and instrumentalities of the crimes enumerated above, as particularly described in Attachment B of the Search Warrant Application, will be located on the computers seized from MICHAEL CURTIS REYNOLDS.

11. Therefore, based upon the foregoing, your affiant seeks authority to search the computers, which were seized from MICHAEL CURTIS REYNOLDS on December 5, 2005.

12. Your affiant, having signed this addendum under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

Joseph P. Noone
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 21st day of December 2005, at Wilkes Barre, Pennsylvania.

MALACHY E. MANNION
United States Magistrate Judge

21st day of December, 2005

The warrant request is on Dec. 21, 2005, but the drawing was already uploaded prior to Dec. 12/2009, as you will see.

# Pittston vs. Ultramar, (3rd Cir).

By 1911, Eagle Works was the largest manufacturer of petroleum-based lubricants on earth, *id.* at 713, processing over 11,000 barrels of crude oil a day. *Id.* at 414. By 1920, however, the rise of the Texas oil fields undermined the economic advantage of east coast refineries, and Eagle Work's production began to decline. George S. Gibb & Evelyn H. Knowlton, *The Resurgent Years: History of Standard Oil Company (New Jersey) 1911-27* 560-61 (1956). Thus, before the middle of this century, the site had begun to pass into obsolescence. Standard Oil abandoned Eagle Works as antiquated in the 1930's, dismantled the refining equipment, but left some of the tanks and pipelines. Kaulaikis Dep. at A1786; 1 B390.

The western and southern ends of the Eagle Works site, *see* B1981, were purchased by **Pittston** for use as a marine oil terminal in 1954 and given the name Tankport. This area of the old refinery was dominated by large storage tanks, *id.*, and it was for storage and transfer of fuel oil that **Pittston** intended to use the site. Some of the Eagle Works tanks remained and were put back into service by **Pittston**. Kaulakis Dep. at A1790. An oil/water separator that is the source of much controversy in this case appears on an old map of the Eagle Works plant, *id.*, and the Court presumes that this was a pre-existing structure taken over by **Pittston**. The Court has appended a map, compiled from various exhibits submitted by the parties, for the guidance of the reader.

During the excavation to find the leak, workers discovered pipes that had been abandoned by the Eagle Works refinery. These pipes were a contributing source to the oil found in the ground in that area. Stendardi Dep. at A2852. This was not the only time abandoned Eagle Works equipment had been discovered. In 1976, an old drainage trap was discovered in the same general area as the leak. In the 1980's, **Pittston** was alerted to the drainage traps' existence by oil leaching in the vicinity. Coleman Dep. at A605-06, A608; B180.

In approximately 1980, the Coast Guard detected leaching from the shoreline in the same area. It was determined that it was lubricating oil of a type that **Pittston** had never handled. Also in the early 1980's several tanks were removed from the site. In connection with this work and by digging in the area to locate unused pipelines, several pipeline were discovered that contained product foreign to the **Pittston** operation. Stendardi Dep. at A2772-74, A2889-91. In May 1983, investigation of a puddle of oil in the tank truck loading area led to the discovery of six more abandoned Eagle Works pipelines.

In each case, **Pittston** maintains that it engaged in the appropriate remedial conduct. For example, it drained and removed the derelict pipelines. The drainage trap was filled with cement and the area excavated in 1983 was "skimmed on a regular basis "to collect any oil in the soil."" Plaintiff's 12G Statement P 269 (citing B183-84).

If they 'skimmed on a regular basis "to collect any oil in the soil"', then there is no soil there, thus, no buildings for the FBI to see......

In the Government's §2255 Response Brief, there is an admission that the Petitioner had no prior knowledge of any conversion of the charged 'hand grenade' possession to an illegal device. That admission is this;

Q.   Did anybody ever tell you, or did you ever learn that those practice grenades might have been redesigned and filled with filler and made that they could be explosive ?

A.   I ONLY LEARNED AFTER I SAW THE PHOTOS HERE.

That date was July 12, 2005, the arrest for it was Dec. 20, 2005. Thus, as can be seen in the Transcripts, pgs. 683-85, there was no prior knowledge of illegality. The Petitioner was not in the United States, but in Austria and Thailand, since March 19, 2005. He could not have had any prior knowledge of the devices alterations.

JOSEPH O'BRIEN's TELEPHONE TRANSCRIPT

## JOSEPH O'BRIEN WAS COURT-APPOINTED COUNSEL OF RECORD FOR CASE 05-CR-0493

JOSEPH      : Hi Mike, What's on your mind?

PETITIONER : I just got this document from the psychiatrist in MCC, New York. Have you read it yet?

JOSEPH      : Yes, Why?

PETITIONER : There's a part where she discusses the perjury in this case, you read that part?

JOSEPH      : No, why?

PETITIONER : It says the psychiatrist talked to both attorneys about it. Both Attorneys as in two, as in YOU AND JOHN GURGANUS, AND SHE WAS TOLD THE PERJURY NEVER HAPPENED, Did you ever tell her that?

JOSEPH      : No, I didn't.

PETITIONER : So you never told her that the Prosecutor did not commit perjury?

JOSEPH      : NO, NEVER.

PETITIONER : And you were in the room when the Prosecutor was told that this was perjured, the Affidavit of Probable Cause?

JOSEPH      : Yes, it was.

PETITIONER : So, the Prosecutor did commit perjury to the Grand Jury then?

JOSEPH      : EVERYTIME THAT HE READ IT, YES.

PETITIONER : ok then, thanks Joe.

A1



**U.S. Department of Justice** *Page 2*

**Peter J. Smith**
United States Attorney
Middle District of Pennsylvania

*William J. Nealon Federal Building*
*Suite 311*
*235 N. Washington Ave.*
*P.O. Box 309*
*Scranton, PA. 18501-0309*
*(570) 348-2800*
*FAX (570) 348-2816/348-2830*

*Ronald Reagan Federal Building,*
*Suite 220*
*228 Walnut Street*
*P.O. Box 11754*
*Harrisburg, PA 17108-1754*
*(717) 221-4482*
*FAX (717) 221-4493/221-2246*

*Herman T. Schneebeli Federal Building*
*Suite 316*
*240 West Third Street*
*Williamsport, PA 17701-6465*
*(570) 326-1935*
*FAX (570) 326-7916*

Please respond to this office ☐          Please respond to this office ☒          Please respond to this office ☐

September 28, 2010

Re:    Reynolds v. Whitehead, et a.,
       No. 10-3813 (3rd Cir) (M.D. Pa. No. 10-1514)

I am an Assistant U.S. Attorney for the United States Attorney's Office in the Middle District of Pennsylvania. Today, I received a copy of the Court's case opening information in the above-referenced case. Appellant is Michael Reynolds, a federal prisoner.

Please be advised that I am unable to enter my appearance for the appellees, larry Whitehead and Joseph Noone, in that I do not have the necessary approval to represent him in appellant's <u>Bivens</u> action against them. To explain, the Code of Federal Regulations provides, in pertinent part:

> [A] federal employee . . . may be provided representation in civil, criminal, and Congressional proceedings in which he is sued, subpoenaed, or charged in his <u>individual capacity</u>, . . . when the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment <u>and the Attorney General or his designee determines that providing representation would otherwise be in the interest of the United States.</u>
> . . .

28 C.F.R. § 50.15(a)(emphasis added).

Sincerely,

PETER J. SMITH
United States Attorney



/s/ Kate L. Mershimer
KATE L. MERSHIMER
Assistant U.S. Attorney